May it please the court, my name is Todd Christopher Tucci. I represent Western Watersheds Project plaintiff appellants in this matter, and I'd like to retain five minutes for rebuttal, and I'll release myself. Your honors, there's no dispute that Western Watersheds Project prevailed in its challenge to BLM's grazing authorizations on 36 allotments in the garbage resource area of southwestern Idaho. There's equally no dispute that BLM's interpretation of its management obligations under its land use plan, that is the garbage RMP, conflicted with the plain language, and as a district court held, was plainly erroneous. Now despite finding that Western Watersheds Project prevailed in this litigation, the judge denied my client's motion for fees, finding that BLM's plainly erroneous interpretation was substantially justified. The district court abused its discretion by first applying the incorrect law, and second, because the record doesn't contain any evidence supporting the district court's determination that BLM was in the middle of a crisis when it issued these grazing decisions in February through June of 2008. Turning first to the district court's first district court. The district court was right on the scene. I mean, what do you mean that there wasn't a crisis? The Murphy Complex fire ignited in middle of July 2007. It was under control on August 2nd, 2007. The BLM had issued emergency rehabilitation and stabilization plans on September 11th, 2007. They didn't come out with the grazing decisions that authorized grazing on these allotments until February through June 2008, fully eight or nine months, ten months after the fire commenced. So the judge may have been on the scene, but the fact of the matter is, is that the emergency stabilization and rehabilitation plans, ER 303, the BLM specifically said, we are not issuing grazing decisions at that time. That will come at a separate time. And then they went about their normal communications. This is in the record, normal communications with the livestock permittees, the back and forth, asking the livestock permittees, how do you want to graze? And then it wasn't until seven or eight months later that BLM adopted its grazing decisions that suffered from the same unreasonable or plainly erroneous interpretation of the RMP that the judge found in 2005. Can we take it, can we just assume that the government can recover from a catastrophic emergency situation in six months? Well, Judge Schroeder, ma'am, there's two problems here. One is that, as Judge Schroeder, you noted in the case of League of Women Voters of California and the Cali case, that the position of the United States has two elements. One is the underlying agency decision, and two is the agency's litigation position. So the agency's litigation position was a court never considered. That wasn't made until 14 months later when they were defending it in federal court in a 10-day evidentiary hearing in November of 2008, fully 14 months after the fire. Now, if you want to ‑‑ so that's one portion. One portion of the problem is that the judge never considered the agency's litigation position. And the agency's litigation position is ‑‑ BLM bears the burden of demonstrating that a position was substantially justified, and this court in the Morolf case in Ninth Circuit recognized that this court has to evaluate the, quote, basic arguments the government put forth to determine whether they have a reasonable basis in fact and law. In the district court, fully 14 months after the fire was controlled, the BLM counsel argued the exact same thing that the judge rejected in 2005, that is the garbage resource management plan was wholly discretionary. That was their argument. In their findings of fact, they never once cited the court's 2005 decision. And so this interpretation is unreasonable for two primary reasons. One, the BLM itself, in the analysis of the management situation issued four months before the fire, acknowledged that the garbage RNP required them to avoid adversely affecting sage grass and other species. BLM acknowledged that, and that's also in the record. And secondly, the BLM's litigation position also contradicted the district court's 2005 order. And in this, in the Ninth Circuit case the district court took that into account. The district court, respectfully, Your Honor, the district court took that into account respecting the BLM managers, not the litigation position. Excerpts of the record 5, Your Honor, you'll find the substantial justification determination, and it talks in response to the BLM managers. It never talks about the litigation position that the Department of Justice and BLM constructed, which resuscitated the now discredited interpretation of the RNP. It says the judge said while the BLM was committed the same error interpretation after the fire as it did before, its post-fire error was the result of managers scrambling to salvage something from a disaster. That's the managers. The judge focused on the managers, not the litigation position. And the next sentence is the BLM had closed over 600,000 acres to grazing and was struggling to determine how to manage the small parcels unaffected by fire. There's two problems with that sentence, Judge Schroederman. First, they hadn't closed, at that point they hadn't closed over 600,000. That was in February through June is when they closed the parcels affected by the fire. In the Thangarajah case, this court held that an agency's litigation position that ignores adverse authority does not have a reasonable basis in law and that it is not substantially justified. That's the same situation here. Never once did BLM submit to the district court or discuss or distinguish or even identify the district court's 2005 order finding that BLM's interpretation of the wildlife management provisions as description error. Right after the passage you read, did the court in the next sentence say that a reasonable argument could be made for the agency position in light of the fire? The next sentence does say that, Your Honor. I have two responses to that. First, that again focuses on the underlying agency decision. In League of Conservation, League of Women Voters of California and the Cowley case, Judge Schroeder and the former, sitting on the panel in the latter, acknowledge that the position of the United States has two essential elements. That is clear. The question is whether the district court satisfied that. Okay. And that's the problem that I think we have. When he says a reasonable argument could be made. To defend. How do we know that's not talking about made by the government in its litigating position? Because this one paragraph of substantial justification focuses, as the sentence that I read, on the result of the manager scrambling. It doesn't talk about the intermediate 14 months between the fire and when the BLM's attorneys constructed their litigation position. You're saying in the sentence that we're focusing on, it says, the landscape had so changed that a reasonable argument could be made to support the BLM's management. And the reason that use of the term management is used there, you're suggesting, as it goes back two sentences earlier, to not to their litigating position, but to what, in fact, the managers had done. The underlying grazing decision. Yes. Yes, Your Honor. But what do you make of the fact of, as we're parsing through the poor district judge's opinion, the following sentence after the one we just looked at. Indeed, the court had enough confidence in the BLM, and now he's talking about them, I think, in the overall litigation, to refuse to enjoin grazing, a confidence the court would never have placed in a party that was willfully ignoring the court's prior rulings. So isn't he saying there, well, I heard what they said, the position they took, which I think was wrong. I've told them it's wrong. But I didn't get the sense that in the difficult situation that they were facing,  they were just trying to make the, you know, they were scrambling, as he says. Your Honor, that only makes sense when you look at the agency's, the underlying agency decision, not 14 months later when the lawyer. Well, I do understand that. But the sentence that I'm having trouble, the phrase I'm having trouble with, says the landscape had so changed that a reasonable argument could be made to support the BLM's management. And then the next phrase, even if that argument ultimately proved unsuccessful. Now, isn't the court talking about the litigation? I don't think so. I don't believe so. I don't believe that's a fair reading. And, Your Honors. Well, when did it prove ultimately unsuccessful? It was in the litigation, wasn't it? Pardon? It proved ultimately unsuccessful, the taking the same old position, proved unsuccessful in the litigation, didn't it? It did. It was unsuccessful because the court said you lose, right? But you can say, Your Honor, that is accurate, but you can say the same for the underlying grazing decisions, which were found to be unsuccessful. But even if the court did consider, even if this one paragraph substantial justification determination can be found to have reviewed the litigation position, that is abuse of discretion based on the Wilderness Society case and the Thangarajah case. This court said in Thangarajah that an agency's litigation position that ignores adverse authority doesn't have a reasonable basis in fact. And the court never examined the, it's 2005, I'm sorry, ma'am. Yeah. It's 2005 order as it applies to the court's litigation position. That case controls this. And then if we're looking towards the argument that BLM's position is inconsistent with its earlier interpretation of the Wilderness Society case, the Wilderness Society case that this court held that an agency that takes an interpretation of its management obligations in a manner that contradicts an earlier interpretation is not substantially justified. Well, it's all the same litigation. And if the facts at one point in the litigation totally change, can't that be the basis for a litigant taking a position that had previously been ruled erroneous? Because cases are decided on the basis of law and facts. But that would be if the agency's interpretation of the RMP turned on facts. But it doesn't. It turns on the RMP's requirement that the BLM protect and enhance sensitive species. That is not discretionary whether there's a fire or not. The obligation of the RMP, as the court found, is to protect and enhance sensitive species. That does not turn. That obligation does not turn on whether there's a fire. The garbage RMP is in place. If they wanted to modify their management obligations, they could have moved to amend the RMP and say, you know what? In light of these new circumstances, these management obligations are no longer obligations. They're discretionary. They could have done that. They didn't. What they did is they simply ignored the judge's 2005 order finding that they were mandatory. Is that sufficient, Your Honor? I understand your position. And then going to the underlying grazing decision, separate and apart from whether the court examined the litigation position, separate and apart from whether that litigation position was reasonable, the underlying grazing decisions are not substantially justified. In the trio of cases, the Mendenhall case, the Minehold, and the Madigan case, this court has repeatedly held that an agency position that violates the Constitution, a statute, a regulation, or an agency rule, in that circumstance, a finding that the government was substantially justified is an abuse of discretion, unless the statute is ambiguous, complex, or required exceptional analysis. The judge never talked about that. And furthermore, that controls here because there's no way that because the judge interpreted it in 2005, any interpretation can be ambiguous. The interpretation of the RMP as requiring mandatory wildlife protections was already adjudicated by this court. The BLM's response is that proper interpretation of the RMP, at its brief on page 19, proper interpretation of the RMP was a matter of first impression with no clear precedent to follow. That's only if you put your blinders on and don't look at the court's 2005 order. The court already interpreted it. Under Minehold, Madigan, and Mendenhall, the district court's determination that the underlying grazing decisions were substantially justified is ‑‑ Am I correct that the fees that we're talking about are only the fees incurred after the fire? Yes, ma'am. They are. And just to be clear, if this court agrees with Western Watersheds Project and remands it to the district court, that doesn't mean we are ‑‑ we still have to go through what are the reasonable fees. It doesn't mean that the entire ‑‑ No, you've simply asked for fees. You haven't put an amount on it yet. No, we have. What is that? It is $497,000. It was for a 10‑day evidentiary hearing as well as prebriefing and postbriefing. But the court still has the obligation to go through and determine what is a reasonable fee. And, Your Honors, you know that there's a balancing act in terms of what we succeeded on versus what we didn't succeed. And so what we're asking is simply to remand it back to the district court with a finding that BLM's position was not substantially justified, and then we can go through the next process. Do we have ‑‑ can we do that? Or do we have to ‑‑ or isn't your position really closer to the district court didn't really decide, evaluate whether your litigation position, whether the litigation position was substantially justified? There is an alternative, which you just ‑‑ the court remands back to the district court to say, hey, district court, you didn't look at the litigation position, now look at it. But I will note that that is not the traditional role that this court has played. When you look at the Gavilan case, the Merolf case, the Wilderness Society, and Barnhart case, in those four cases and more, this court found that the district court improperly examined the two elements of the position of the United States and then itself examined whether they were substantially justified. So it is an option, and I'm happy ‑‑ we will be back in front of Judge Windmill one way or another if you rule for me, and if the Ninth Circuit decides, if you decide to remand it back for the district court to examine the litigation position, that's okay as well. If we rule for you, we then ask Judge Windmill to determine what's a reasonable fee for what you prevailed on, right? That's ‑‑ yes, that is going ‑‑ if you rule for us, that will ‑‑ it will go back to Judge Windmill to determine a reasonable fee in light of the success on the primary claims and more limited success or no success on the subsidiary claims. I believe Judge Schroeder was asking, is there another alternative, which is to remand it back to Judge Windmill to say, Judge Windmill, you got ‑‑ you didn't look at the litigation position. Now look at it. And that is available. It's just not the way the Ninth Circuit has treated it in the cases that I've reviewed and cited. Or that you would prefer. I ‑‑ if this court, if this panel would like to reverse the ‑‑ Take your remand, no matter how you get it, right? I will take it. Thank you. So is it reverse and remand or vacate and remand or neither of the above? Your Honor, it's affirmed. No question. In the alternative reverse and remand, if the court did believe that Judge Windmill did not consider the issue of the government's position on litigation and that this court felt uncomfortable making that determination itself, there is every reason, Your Honors, this is ‑‑ I'm Serena Case Hargrove for the government. There is every reason to believe that the district court knew and considered both positions of the government, the underlying agency position and the government's litigation position. First of all, both sides argued about the two positions and made it very clear that the court needed to consider both. Secondly, the district court decision cites the correct case law. It cites Gonzales v. Free Speech Coalition, which clearly articulates the need to consider both. Thirdly, there's really no reason to separate the two positions here. The government defended the underlying decision on its merits and there were no extraneous circumstances, as there were in Gavilan and as were discussed in Cali. In Gavilan, there was a statute of limitations bar that should have precluded the government from proceeding with suit. There was obviously nothing like that here. Furthermore, Your Honors, there was no controlling precedent. The 2005 decision did not control the agency's decision here for a very important reason. The court, in its decision on page excerpts of Record 19, goes through all the regulations that govern annual grazing plans. Annual grazing plans are what WWP challenged in this case, in their complaint in 2008. These are annual plans that the agency gives to grazers that provide very detailed instructions on which allotments to graze, how to graze, or which pastures to graze within their allotments, how to graze them, and so on. There's a good example in the excerpts of Record on page 188, and you can see how very specific those are. Those were what WWP challenged in this litigation. Now, in the 2004 litigation, WWP challenged something very different. WWP challenged the bigger policy-level decisions that go into permit grants and permit renewals. In the 2004 decision, there were a number of permits at issue that were 10-year grazing authorizations. At that point, the agency is in the business of giving out rights. It has a lot of leeway regarding whether it can increase grazing, decrease grazing, and so on. When the court held in 2005 that the agency absolutely had to consult the resource management plan, which was the overarching plan that governed agency decisions like giving out permits, that was one very clear decision. Now, in 2008, there were permits already in place. Permits were not challenged in the 2008 case. What were challenged were these much smaller incremental decisions, and so the agency the court held made the same conceptual error, but it didn't pay enough attention to the resource management plan, and the court held that unquestionably. But the agency did so in a very different context with very different regulations governing. Once permits are in place, permittees have due process rights. The court acknowledged the agency couldn't go in and strip permittees of their grazing rights on unburned allotments without going through some substantial process. And we make this point in our brief on page 18, the district court in its decision on year 19. There are a lot of regulations that apply when permits are already in place and permittees are counting on those entitlements. So for the agency to take on, after this tremendous fire, to take on another challenge and interpret its regs as they had never been interpreted before, to allow the agency to go in and strip permit rights from folks whose allotments had not burned would be pretty daring and challenging and thinking outside the box. Now, Judge Windmill held that they do need to do that a little more and the agency will do so. But the court explained the agency was already overburdened. It was in the process, because of this monstrous fire that covered more than half of its resource area, of negotiating all of the permit suspensions for the allotments that had burned or that had partially burned. And there are some really good examples of that in the excerpts of record as well. ER page 288, I believe, has an example where a permittee is writing notes to the agency about his particular allotments, saying, no, but I really want to be able to graze this allotment, this particular pasture, sooner than you think I should be able to. They had to go through this really remarkable process with all of their permittees, whose allotments had burned or had partially burned. And the fact that the agency chose not to do something daring with allotments that hadn't burned was a mistake Judge Windmill held, but not unreasonable, given how overloaded the agency was. Which goes to that question of Judge Windmill's finding that the agency was in a crisis. To be sure, I think opposing counsel has pointed out very clearly, there was no longer a public health and safety crisis when the agency was issuing these annual grazing plans that were challenged in this case. But there was an administrative crisis, because the BLM had to, with its limited resources on this vast area, redo all the grazing plans for 2007, the rest of that year, and do the ones for 2008, in the areas that had burned. And so it had a tremendous amount of work there. It was also in the process of building fences to keep cows out of burned areas, et cetera, et cetera. So there really was a very real administrative crisis going on. And Judge Windmill recognized that. So what the agency did was it maintained the status quo. And that's what Judge Windmill found. And he found that twice. Well, he found it once in his findings of fact, ER 26, paragraph 248. And then he also noted it again in his conclusions of law, that what the agency did was it maintained the status quo in those unburned allotments. And that was a mistake, but it wasn't a terrible mistake, and it was a reasonable decision in light of what the agency was facing. Judge Windmill did hold a 10-day evidentiary hearing in this case. And he was in an unusually good position to determine whether the agency's position, both in litigation, which he watched, was substantially justified, and the agency's underlying position was substantially justified. And, Your Honors, the government would submit that he did not abuse his discretion. And you're saying that in the 10-day hearing and in the briefing to Judge Windmill after that hearing, the parties agreed on the applicable standard, which was? Mostly, Your Honor, there were some disagreements around the edges about what burden the government had to prove it to and so on. With respect to the need to establish both the litigating position and the underlying decision, there was no material dispute between the parties as to that standard? That's correct, Your Honor. There wasn't. And it's in our brief before the district court on ER, page 76 and 78, and their brief, ER, page 83. I would also say our briefs also focused the judge on the fact that the court had to consider the entire civil case as an inclusive whole. We made that point very forcefully in our response brief, and WWP agreed with that in their reply brief. So I find it hard to fault Judge Windmill for then doing that and making one finding, which is what the statute requires, one finding, although he, I think, absolutely knew there were two questions that informed that one finding. Unless the panel has any further questions, the government would submit and respectfully request that the court affirm the district court's decision. Okay. Hearing none, I guess the government can relax. We'll let the panel to have its brew bottle. Thank you, Your Honor. Thank you, Todd Tucci, again. The argument that there was an administrative crisis is no basis in the record. The agency, the government has pointed to nothing in the transcripts, nothing in the excerpts of the record that show that BLM did anything abnormal during the time of the fire prior to issuing the grazing authorizations that we challenged in February through June. In line with practical points, does the record show how many ranchers are grazing in this area? It does. Yes, it does, Your Honor, and there is an authorization for each of the 28 allotments that we're litigating. Does the record show how the fire would have affected those ranchers' ability to graze and survive? It does show the extent of the – the excerpts of the record before this panel does show the extent of the fire by allotment. Okay. Then does the record show if the BLM was reacting to that situation and trying to reassess what it should do? The record does contain annual grazing plans, which are the decisions that my client has challenged. Those are in the excerpts of the record. Yes, sir. This – that's part one. Part two, the last argument that my sister counsel made, this inclusive whole, BLM is conflating three entirely different concepts here. The inclusive whole from the Gene case refers to a single evaluation of substantial justification across all phases of litigation, that is, the merits, the remedy, and the fee phase. In that case, the Supreme Court said that the court – the district court doesn't need to make a second substantial justification determination during the fee stage prior to granting fees. What the BLM is arguing is this holistic approach in its brief, which has been soundly rejected by every court that has looked at this, which my research has shown, including the Clark case in the Ninth Circuit, the Flores case in the Ninth Circuit, ORNC v. Marsh in the Ninth Circuit, which says in determining substantial justification, this court looks only to the claims that plaintiff prevailed. You don't look to the entirety of the case. So this inclusive whole talks about across all phases of litigation, not all claims. Footnote four in my reply brief also goes through a whole variety of other cases that so hold. This holistic approach has not just been rejected in this case, in this circuit, but also in the D.C. Circuit, repeatedly rejects this idea that you look at a case of an inclusive whole when you determine substantial justification. The D.C. Circuit, too, looks at only the claims for which the plaintiff prevailed. And lastly, this idea of – I'm sorry. As I understood what your adversary was arguing with regard to the discretionary versus mandatory aspects, which you say they completely ignored. The decision, the earlier decision, referred in holding that certain provisions were mandatory, referred to certain particular provisions. It didn't say the whole plan. It said certain provisions. And she says now there were different provisions of a much narrower sort before the court, and therefore the argument that there, there was some discretion was not precluded. What about that? Well, I think, Your Honor, I think with respect, that's not what my sister counsel argued. The distinction between a long-term grazing permit and whether the provisions apply versus an annual authorization and whether the provisions apply. BLM is arguing that these provisions don't apply to annual grazing authorizations. Two responses very fast, and I appreciate the indulgence. One, that case, that argument was never raised. They've never raised it anywhere. It's not in their brief. I haven't had a chance to respond to it. And second, and more forcefully, this Court, I direct this Court, I don't have the site because they didn't raise it, but look at the Oregon Natural Desert Association case, which says FLTMA and the RMP provisions apply equally to annual grazing authorizations and long-term permits. Thank you. Thank you very much. Very challenging case. Western Watershed Project shall be submitted. And we thank counsel for their fine arguments. Wish you a good trip back to Boise. All rise.
judges: Rakoff, Schroeder, Gould